No. 22-2131

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

NMSURF, INC.

Plaintiff-Appellant,

v.

ALAN WEBBER, in his official capacity as
Mayor of the City of Santa Fe, et al.,

Defendants-Appellees,

and

CITY OF SANTA FE,

Defendant.

On Appeal from the United States District Court for New Mexico
Judge Gonzales, Presiding, No: 17-CV-355-KG-SCY

**PRINCIPAL BRIEF
OF PLAINTIFF-APPELLANT NMSURF, INC.**
formerly known as CNSP, Inc.

Catron, Catron & Glassman, P.A.
By: Richard S. Glassman
P.O. Box 788
Santa Fe, NM  87504
(505) 982-1947

ORAL ARGUMENT NOT REQUESTED

Dated:  January 20, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS..........................................................i

TABLE OF AUTHORITIES……………………………………..iv

JURISDICTIONAL STATEMENT……………………………….1

STATEMENT OF THE ISSUES……………………………………1

STATEMENT OF THE CASE AND FACTS ……………………….2
   A.  Procedural History……………………………………….2
   B.  Facts Relevant to the Ordinance's 2% Fee…………………..3
   C.  Facts Regarding the Cybermesa Contract………………….7

SUMMARY OF THE ARGUMENT……………………………….11

ARGUMENT………………………………………………………12

   I.  The Court Should Apply the FCC Cost Test to the 2%
   Ordinance Fee and Find Preemption under Section 253………….12

      A.  The 2004 Qwest Decision Did Not Foreclose
      a Cost-Based Fee Test Under Section 253……………………13

      B.  In 2018, the FCC Adopted a Cost Based Fee Test for
      Section 253……………………………………………….15

      C.  This Court Should Apply the FCC Cost Test
      To Fiber Lines……………………………………..…………16

         1.  Much of the FCC Order Has Broad
         Application, Well Beyond Small Cell……………..…...16

         2.  The FCC's Concepts Were in Part
         Drawn From Fiber Cases…………………………….18

         3.  FCC Policies Applied to Small Cell
         Also Apply to Fiber…………………………………..18

4.  The FCC Test Has Been Applied To Fiber...........19

5.  The Test for Effective Prohibition Should Not Be Limited to Dollar Amount or Degree of Increase.................................................20

6.  That Revenue Percentage Fees Have Been Around a Long Time Does Not Mean They Work Under the 1996 TCA.............................................22

D.  The 2% Fee Does Not Survive the Cost Test.............22

II.  Alternatively, the 2% Fee Fails Because it is Untethered, or Disassociated, From Degree of Use of the PROW.............24

A.  The 2017 Ordinance's 2% Fee Applies Without Regard to Extent or Degree of Use of the PROW.............24

B.  This Dissociation Requires Preemption....................25

III.  The Cybermesa Contract Continues to Give Cybermesa Competitive Advantages Which Should Be Preempted as Prohibitory under Section 253.................................27

A.  A Preference of Subsidy Can be an Effective Prohibition......................................................28

B.  Cybermesa's Competitive Advantages Gave it Impermissible Benefits.............................................30

C.  The Current Status of the Cybermesa Contract is Irrelevant..........................................................32

D.  Cybermesa's Exclusive Use of the Transport Line, Considered Part of the Fiber Line, Is Also an Improper Subsidy or Preference...........................................33

E.  The Section 253(a) Prohibition Created by the Cybermesa Contract is Not Shielded by the Safe

Harbor Provision of Section 253(c)………………………….35

CONCLUSION……………………………………………….…..35

Certificate of Compliance

Certificate of Service

ATTACHMENTS

1. Memorandum Opinion and Order, Doc. 139, filed 9/28/2022
3. Memorandum Opinion and Order, Doc. 148, filed 11/15/2022

# TABLE OF AUTHORITIES

CASES

*AT & T Communications of Southwest, Inc. v. City of Dallas*, 8 F. Supp.2d
    582, (NDTX 1998)……………………………..……………18, 25-26

*Bell Atlantic-Maryland, Inc. v. Prince George's County*, 49 F.Supp.2d 805
 (D. MD. 1999), *vac. on other grounds*, 212 F.3d 863 …………………….18, 26

*Cellco P'ship v. City of Rochester*, 6:192022, WL 3584476
    (W.D.N.Y., August 22, 2022)…………………………………………19-20

*City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020),
    *cert. den.* 141 S. Ct. 2855 (2021).  …………………………...……..16

*Ex Parte Young,* 209 U.S. 123 (1908)………………………………………2

*Puerto Rico Tel. Co. v. Municipality of Guayanilla*, 450 F.3d 9
    (1st Cir. 2006)……………………………………………..……13, 18

*Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258 (10th Cir. 2004)…3, 12-14,
                                                                    21

*Qwest Corp. v. City of Santa Fe*, 1:10-CV-00617 RB/KMB (D.N.M.
    Dec. 2, 2013)……………………………………………………….3, 21

*TCG New York, Inc. v. City of White Plains*, 305 F.3d 67
(2d Cir. 2002)………………………………………………..……….13

*XO Missouri, Inc. v. City of Maryland Heights*, 256 F. Supp.2d 987
(E.D. Mo. 2003)…………………………………………….….…18, 26

*Zayo Group, LLC v. Mayor and City Council of Baltimore*, 2016 WL
3448261 (DMD 2016)……………………………………….……33

## FEDERAL STATUTES

28 U.S.C. § 1291…………………………………………………………1

28 U.S.C. § 1331………………………………………………………1

47 U.S.C. § 253 …………………………1, 3, 4, 5, 11-13, 15-17, 29

47 U.S.C. § 253(a)…………………13, 14, 17, 18, 20, 26, 32, 33, 35

47 U.S.C. § 253(C)……………………..…13, 14, 15, 20, 26, 32, 35

47 U.S.C. §332(c)(7)………………..……………………………15, 17

## ORDERS OF THE FEDERAL COMMUNICATIONS COMMISSION

FCC Order 18-133, titled In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment, WT Docket No. 17-79………………………………11, 15-20, 25, 26, 28, 29

FCC Order 00-309, In the Matter of Western Wireless Corporation, Petition for Preemption of Statutes and Rules Regarding the Kansas Statute and Rules Regarding the Kansas State Universal Service Fund Pursuant to Section 253 of the Communications Act of 1934, File NO. CWD 98-90, August 18, 2000, ………………………………………………………29, 31

FCC Order 17-85, *Sandwich Isles Order* (In the Matter of Connect America Fund, Sandwich Isles Comm., Inc., WC Docket No. 10-90, June 30, 2017)………………………………………………………..31, 32, 35

## NEW MEXICO STATUTES

NMSA (1978) 5-19-1……………………………………………………3

## STATE OF NEW MEXICO REGULATIONS

NMAC 17.11.19.7(D)……………………………………………………5

CITY CODE, CITY OF SANTA FE

Chapter 27-2………………….…………………………….3, 4, 24
and referenced in general throughout pages 1-27

PRIOR APPEALS.  This case was appealed from the same District Court, and Judge Gonzales, as No. 18-2041, then titled CNSP v. City of Santa Fe, and resolved by the Order and Judgment filed January 14, 2019.

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction of both causes of action under 28 U.S.C. § 1331 with questions presented under 47 U.S.C. § 253. Final judgment was issued on September 28, 2022 (Doc. 140), the same day as filing of the Memorandum Opinion and Order (Doc. 139), and a second Memorandum Opinion and Order denying NMSurf's [formerly CNSP] post-judgment motion was filed on November 15, 2022 (Doc. 148). This Court has jurisdiction under 28 U.S.C. § 1291 for review of a final decision. NMSurf's notice of appeal was timely filed October 28, 2022.

## STATEMENT OF THE ISSUES

1. Whether the 2% Fee applied by the City's telecom ordinance, Chapter 2-27 (2017), is preempted under the prohibition standard 47 U.S.C. § 253

2. Alternatively, whether the 2% Fee is preempted under Section 253 due to the disassociation between the 2% Fee and a provider's degree of use of the public right-of-way ("ROW" or "PROW") in the Ordinance or the CNSP [now NMSurf] Franchise Agreement.

3. Whether subsidized preferential treatment given to telecom competitor Cybermesa, Inc. through the 2014 Cybermesa Contract, through which Cybermesa contracted with the City of Santa Fe to construct and operate a fiber line (the "Fiber Line") in downtown Santa Fe, is preempted under Section 253.

## STATEMENT OF THE CASE AND FACTS

### A.  Procedural History

The complaint, filed on March 20, 2017 (Doc. 1), was dismissed by Final Order of Dismissal (Doc. 55) filed March 20, 2018.  On appeal (No. 18-2041), this Court, in the Order and Judgment filed January 14, 2019, affirmed in part, reversed in part, and remanded for further proceedings.

The 2019 amended complaint (Doc. 71) raised two Section 253 claims and dispensed with other claims.  Both claims substituted the mayor and individual city councilors of Santa Fe as defendants (the "City Defendants") in place of the City, based on relief available only under *Ex Parte Young,* 209 U.S. 123 (1908), consistent with this Court's decision.

The District Court issued an opinion (Doc. 139, Appendix ("App.")  Vol. 2, p. 138) and Final Judgment (Doc. 140, App. Vol. 2, p. 164) in which it denied NMSurf's two motions for summary judgment (Docs. 129 and 131, App. Vol. 1, p. 40, and Vol. 2, p. 3) and granted City Defendants' motion for summary judgment on the same issues (Doc. 130, App. Vol. 1, p. 101).  CNSP filed a post-judgment motion for reconsideration on October 26, 2022 (Doc. 141, App. Vol. 2, p. 165, denied by the Court on November 15, 2022 (Doc. 148, App. Vol. 2, p. 182).

Please note that Plaintiff-Appellant was formerly CNSP, Inc., and is now, by a corporate name change, referred to as NMSurf, Inc.

**B. Facts Relevant to the Ordinance's 2% Fee.**

1. The City adopted a telecom ordinance in 1998 (Chapter 27, the "1998 Ordinance") with an appraisal based fee scheme for use of the ROW found preempted under Section 253. *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258 (10th Cir. 2004).

2. In 2010, the City passed a new version of Chapter 27 (the "2010 Ordinance") with a 3% fee on gross revenues. The fee was found to be preempted under Section 253. *Qwest Corp. v. City of Santa Fe* ("Qwest II"), 1:10-CV-00617 RB/KMB (D.N.M. Dec. 2, 2013), Doc. 484, Findings of Fact and Conclusions of Law).

3. The City and Qwest reached a settlement agreement in 2015 (the "2015 Qwest Agreement")(selected pages from the 2015 Qwest Agreement were attached to Doc. 129 as Exhibit ("Ex.") 2, App. Vol. 1, p. 68). This Agreement imposed a 2% fee for dial tone services only. This means the Fee did not apply to other services despite Qwest's use of the ROW for services including wired internet for customers in the City. *Id.*, at Section 1. Defendants state that this Agreement expired but is continuing under NMSA (1978) 5-19-1.

4. In 2017, the City adopted a new version of the telecom ordinance, the Telecommunication Facilities in the Public Rights-of-Way Ordinance, at issue here, cited as Chapter 27-2.1 *et seq*. (App. Vol. 1, p. 18.) It will be referred to

herein as the "2017 Ordinance" or the "Ordinance".  This Ordinance has a 2% gross revenue fee at 27-2.5(A) .

5.  The City granted CNSP [now NMSurf] a telecom franchise under the Ordinance through Franchise Ordinance 2018-13 on May 9, 2018, selected pages of which are attached to Doc. 129, Ex. 3, App. Vol. 1, p. 71, and referred to herein as the "CNSP Franchise".  CNSP had applied on January 15, 2015.

6.  According to City Defendants, "The code does not distinguish charges that occur as a result of the use of infrastructure inside or outside the PROW". Defendants explained that this is similar to fees imposed by ordinances for electric, gas and cable service, stating that "[n]one of these ordinances attempt to distinguish between uses in the PROW or outside the PROW."  Defs. Response to Int. 13, Doc. 129, Ex. 4, App. Vol. 1, p. 87.

7.  The City Defendants could not identify any incremental cost from a new installation, or ongoing operation, by a franchisee of a telecommunications facility in the PROW, such as an underground fiber or wired aerial (i.e. between privately owned utility poles in the PROW) or documents showing the costs.  Defendants response for both was: "Incremental costs are possible.  However, the City does not separately track them."  *Id*., Defs. Response to Int. 14 and 15, App.  Vol. 1, pp. 87-88.

8.  When asked to produce studies and documents on fair and reasonable costs within the scope of Section 253, and direct and actual costs, incurred by the City and associated with use of the PROW by providers, Defendants responded, "The City has no such studies, reports or analyses that identify 'fair and reasonable costs within the scope of 47 U.S.C. sec. 253.'"  *Id*., Defs. Response to RFP 3, App. Vol. 1, p. 89.   The response was later supplemented with a similar answer.  *Id*.

9.  According to Albert Catanach, president of NMSurf, there is no apparent cost incurred by the City when Plaintiff installs fiber between PNM poles in the PROW, or in private utility easement areas.  Catanach Affidavit, Doc. 129, Ex. 6, at ¶ 10, App. Vol. 1, p. 93.

10.  When asked for the financial or legal basis for the 2% Fee, Defendants responded in full, "The City relied on a model ordinance developed by *Matthews Municipal Ordinances*, sec. 34:182, Telecommunications Infrastructure Fee." Defs. Response RFP 8, Doc. 129, Ex. 4, App. Vol. 1, p. 80; Matthews Municipal Ordinance, at Doc. 129, Ex. 7, App. Vol. 1, p. 95.

11.  NMSurf is a state regulated competitive local exchange carrier ("CLEC"), NMAC 17.11.19.7(D), not an incumbent like Qwest.

12.  Plaintiff provides telecom service within City limits, and in other locations in New Mexico.  In the City, Plaintiff provides three kinds of service, fixed wireless internet, wired or fiber internet (wired and fiber are referred to

interchangeably in this context), and VOIP. Of those, only wired or fiber internet is subject to the 2% Fee under both the Ordinance and under the CNSP Franchise. This service is provided by running fiber between PNM poles or underground, which can be in the PROW or in private utility easement areas such as alley ways on private easements. Catanach Affidavit, ¶ 4, Doc. 129, Ex. 6, App. Vol. 1, pp. 91-92.

13. Currently, Plaintiff has fiber beginning at its office on Apache Avenue, running on PNM poles through private property and in the PROW. *Id*, at p. 92.

14. NMSurf has very few customers on fiber internet in the City of Santa Fe, and so its 2% Fee is small. NMSURF has plans to expand. *Id*., at pp. 92-93.

15. Wireless service is subject to fees in the Ordinance. The CNSP Franchise, like the other franchises, excludes wireless from its scope. (CNSP Franchise, Doc. 129, Ex. 3, App. Vol. 1, p. 74, Sec. 2(B)2, definition of 'gross charge'.)

16. The City received $2,437,496 in payment from PNM from December, 2019 to December, 2020, for PNM's ongoing use or operation of utility poles located with City limits. Defs.' Response Int. 16, Doc. 129, Ex. 4, App. Vol. 1, p. 88. Plaintiff pays PNM $830.10 per year for attachment to 114 poles. PNM bill to Plaintiff, dated March 2, 2021, Doc. 129, Ex. 8, App. Vol. 1, p. 100.

C.     **Facts Regarding the Cybermesa Contract.**

17.  The City entered into a contract with local internet company

Cybermesa, Inc. in March, 2014 (the "Contract"), entitled City of Santa Fe

Professional Services Agreement for Fiber Optic, Telecommunications Service

Network, with its purpose stated to "develop a fiber optic telecommunications

service network".  Contract, at p. 1, Doc. 131, Ex. 3, App. Vol. 2, p. 35.  (A partial

copy of the Contract is found at App. Vol. 2, p. 35, as noted; a full copy may be

found as Ex. 3 to Doc. 130, App. Vol. 1, p. 147).  This network, referred to as the

"Fiber Line", was to start at the telephone exchange building on Alameda Street,

also referred to as the CenturyLink Central Office.  Catanach Affidavit, ¶ 5, Ex. 2

to Doc. 131, App. Vol. 2, p. 29-30 .

18.  Under the Contract, Cybermesa would "design, procure and install

telecommunications facilities".  Contract, Ex. 3 to Doc. 131, at p. 1; App. Vol. 2, p.

35.  The contractual cost of the design, installation and construction, to an

operational phase, was $882,100.00.  *Id.*, at p. 37.  Cybermesa was also given the

right to operate and maintain the "Project" and provide wholesale open access

services to qualified providers that wish to connect to the network.  *Id*., at p. 35,

36, 38.  No provider other then Cybermesa has ever used the Fiber Line.  Catanach

Affidavit, Ex., 2 to Doc 131, App. Vol. 2, p. 30.

19.    The compensation to Cybermesa (Contract, at p. 5, App. ) included the right to own two buffer tubes of 12 strands each (i.e. 24 fiber strands) of the Fiber Line, as referenced in attached Schedule 3.  (Contract, Doc. 131, Ex. 3, Section 3D(2)b, App. Vol. 2, p. 38).  City Defendants have suggested that the City owns these tubes.

20.  The Conditions Precedent section of the Contract, stated that the City would obtain "transport" from the State of New Mexico, and would "assign to Contractor [Cybermesa] two gigabits per second of transport from a co-location facility at the Simms Building to ABQ GigaPop."  Contract, Section 5(1) and (2), at p. 5, Doc. 131, Ex. 3, App. Vol. 2, p. 39-.  (This line from the Simms Building to Albuquerque is referred to herein as the "Transport Line".)

21.  The City entered into a Memorandum of Understanding ("MOU") with the State of New Mexico Department of Information Technology (DoIT), under which DoIT would provide the City "with backhaul capacity from the Simms Building to 505 Marquette in Albuquerque on existing DoIT bandwidth."  (This is the Transport Line).  Doc. 131, Ex. 4, App. Vol. 2, p. 44.

22.  The Fiber Line travels from Central Offices at 121 E. Alameda to 715 Alta Vista, the Simms Building, which is the location of the start of the Transport Line. Cybermesa Contract, Doc. 131, Ex. 3, Schedule 1, App. Vol. 2, p. 41.

23.  The Fiber Line connects to offices at the Railyard downtown, at 500 Market Street.  (Memo, at p. 4, Conceptual Layout, and p. 5, Interior Improvements for SF Fiber, Doc. 131, Ex. 1, App. Vol. 2, p. 23; Catanach Affidavit, ¶ 2, Ex. 2 to Doc. 131, Vol. 2, p. 29).

24.  Cybermesa put wireless access points and backhauls on the roof of the Market Street building at the Santa Fe Railyard, home to City offices, to interconnect with wireless signals to other areas within the City and outside the City such as the Lensic Building, Plaza WiFi, The Santa Fe Opera, Los Caminitos, Santa Fe Institute and Hyde Park Estates.  (Catanach Affidavit, including photos of antennas and FCC License, Doc. 131, Ex. 2, App. Vol. 2, p. 30, 32-34).

25.  As a result, Cybermesa was up and running with the Fiber Line connecting to its antennas at the Market Street office roofs in the Railyard area, creating an entire fiber and wireless network.

26.  Cybermesa was able to offer its service without having to pay for construction of the Fiber Line, on which the City spent close to a million dollars in 2014.  Cybermesa was able to connect to Albuquerque, through the Transport Line, for free, where other companies such as Plaintiff would have to pay providers such as Comcast, Century Link or Plateau about $4,000 per month for that service, including taxes and the federal universal service fee, not to mention additional cost for rack space.  Catanach Affidavit, ¶ 8, Doc. 131, Ex. 2, App. Vol. 2, p. 30.

27.  Several customers moved from NMSurf to Cybermesa in the downtown area as a direct result of its use of the Fiber Line, which some customers preferred to other signals.  *Id*., at ¶ 9.

28.  For Plaintiff to lease use of the Fiber Line from Cybermesa, it would have to install additional fiber, about one mile long, to connect from Alta Vista Street to the Fiber Line's Market Street connection point, at an estimated cost of $500,000 to $1,000,000.  *Id*.  Plaintiff cannot access the Transport Line unless Cybermesa is removed from it, because the technology allows access to only a single provider.  *Id*., at ¶ 8.

29.  Sean Moody, the author of some of the City's discovery responses in this case, wrote in an email to Albert Catanach in April, 2021, that the Contract is still in effect, on a month to month basis.  Email dated April 19, 2021. Doc. 131, Ex. 6, App. Vol. 2, p. 54.  Mr. Moody added that the Santa Fe Fiber Line network includes the fiber line from the Simms Building to 505 Marquette Street, in Albuquerque, which is what is referred to in this Motion as the Transport Line.  *Id*.

30.  The District Court pointed out that despite the apparent expiration of the term of the Contract, Santa Fe "represents" in its briefing that there are holdover provisions, "for 'operation and maintenance of the City's fiber broadband project, for compensation.'"  Opinion, Doc. 139, at p. 20, App. Vol. 2, p. 157, citing Doc. 132, at p. 21, App. Vol. 2, p. 78, and Doc. 130 at p. 16, App. Vol. 1, p. 116.

31.  Cybermesa continues to use the Fiber Line.  Defs. Response to Int. 1, Doc. 131, Ex. 7, App. Vol. 2, p. 57.

## SUMMARY OF THE ARGUMENT

The Court should revisit the material prohibition standard under 47 U.S.C. § 253 in light of the cost-based test adopted by the FCC in FCC Order 18-133. Although adopted for small cell wireless, the Order has broad reasoning and application with policies that go beyond small cell.  The Fee was not adopted based on cost incurred by the City; it is an old-style revenue producer of the sort that predates the 1996 Telecommunications Act ("TCA").  Additionally, the 2% Fee lacks sufficient connection to degree of use of the ROW by providers, and should be preempted under Section 253 for that reason as well.

 Cybermesa continues to benefit through use of the Fiber Line and Transport Line, for which it did not have to make a capital investment.  Other providers were not given this subsidy.  Under FCC decisions, this kind of action distorts normal competitive pricing and should be characterized as a prohibition under Section 253, for which the City Defendants should be ordered to terminate the continued use.

# ARGUMENT

Plaintiff-Appellant NMSurf, Inc., formerly CNSP, Inc., seeks this Court to apply 47 U.S.C. § 253, of the 1996 Telecommunications Act (TCA).  NMSurf is appealing the Memorandum Opinion and Order (the "Opinion", Doc. 139, App. Vol. 2, p. 138), adopted in the Final Judgment (Doc. 140, App. Vol. 2, p. 164) granting the City Defendants' Motion for Summary Judgment, Doc. 130, App. Vol. 1, p. 101, and denying NMSurf's two Motions for Summary Judgment (Docs. 129 and 131, App. Vol. 1, p. 40, and Vol. 2, p. 3, and the Memorandum Opinion and Order (Doc. 148, App. Vol. 2, p. 182) which denied NMSurf's Motion for Reconsideration (Doc. 141, App. Vol. 2, p. 165).  NMSurf notes that its Motion at Doc.130 addressed the 2% Fee, and its Motion at Doc. 131 addressed the Cybermesa Contract.  The City Defendants addressed both of those issues in their Motion at Doc. 130, and the parties filed single responses and replies to the three Motions.

## I.  THE COURT SHOULD APPLY THE FCC COST TEST TO THE 2% ORDINANCE FEE AND FIND PREEMPTION UNDER SECTION 253.

This is an appeal of the granting of summary judgment motions *de novo*. *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1264-65 (10th Cir. 2004). Summary judgment is appropriate if there is no genuine issue as to any material

fact and the moving party is entitled to judgment as a matter of law. The court is to view the evidence in a light most favorable to the non-moving party. *Id.*

Sections 253(a) and (c) state in full:

(a) In general
No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(c) State and local government authority
Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and non-discriminatory basis, if the compensation required is publicly disclosed by such government.

## A. The 2004 Qwest Decision Did Not Foreclose a Cost-Based Fee Test Under Section 253.

Many courts, including this one, have stated that a Section 253(a) prohibition need not be an absolute, or insurmountable, barrier. *Qwest*, 380 F.3d at p. 1269, *Puerto Rico Tel. Co. v. Municipality of Guayanilla*, 450 F.3d 9, 18 (1st Cir. 2006), *TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002). The test is whether the regulation materially inhibits or limits the competitor. *Guayanilla*, 450 F.3d at 18; FCC Order 18-133, at ¶ 35. This Court in *Qwest* found that "the rental provisions are prohibitive because they create a massive increase in cost." *Qwest*, 380 F.3d at 1271.

Although no detailed test on prohibition was adopted, *Qwest* referenced the concept of cost based fees, stating, "Merely allowing the City to recoup its processing costs, however, cannot in and of itself prohibit the provision of services." *Id*., at 1269. In reference to Section 253(c), this Court noted the parties' disagreement about whether it should measure " 'fair and reasonable' by the City's costs or by a 'totality of the circumstances' test which would allow for higher compensation." *Id*., at 1272. As the City acknowledged that the rent was not limited to recovery of costs, the Court looked only to the totality test without choosing between that and a cost test. Concluding that the Ordinance's compensation scheme violated "even" the totality test, the analysis came to an end and a cost analysis was unnecessary. *Id*., at 1273.

It appears from this review that *Qwest*, both with respect to Section 253(a) and 253(c), was open to a cost based fee analysis, but did not need to resolve that question to decide the 2004 case.

The District Court focused on case law concepts like whether there was a massive increase in fees (Opinion, at p. 16, Doc. 139, App. 344), and whether the 2% Fee cut into NMSurf's profit or ability to expand. *Id*., at p. 15.[1]

---

[1] The District Court also raised the 'totality of the circumstances' test in reference to Section 253(a), Opinion, at p. 12, although in Qwest that was a Section 253(c) test. It does not appear that the District Court applied the totality test in the Opinion, however.

**B.  In 2018, the FCC Adopted a Cost-Based Fee Test for Section 253.**

On September 26, 2018, the FCC issued an order titled In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment, WT Docket No. 17-79, and identified as FCC Order 18-133.  The FCC ruled that "fees are only permitted to the extent they represent a reasonable approximation of the local government's objectively reasonable costs, and are non-discriminatory."  FCC 18-133, at ¶ 32.  Similarly, the Order stated:

> 50.  We conclude that ROW access fees, and fees for the use of government property in the ROW, such as light poles, traffic lights, utility poles and other similar property suitable for hosting Small Wireless Facilities, as well as application or review fees and similar fees imposed by a state or local government as part of the regulation of the deployment of Small Wireless Facilities inside and outside the ROW, violate Sections 253 and 332(c)(7) unless these conditions are met:  (1) the fees are a reasonable approximation of the state or local government's costs, (2) only objectively reasonable costs are factored into those fees, and (3) the fees are no higher than the fees charged to similarly-situated competitors in similar situations.

*Id*., at ¶ 50 (footnotes omitted).

The FCC clarified that by costs, it meant "those costs specifically related to and caused by the deployment."  *Id*., at fn 131.  Thus, under this Order, fees must be cost based, the costs must be reasonable, and the costs are only those caused by the deployment.  The test also includes factors from the fair and reasonable provision at Section 253(c), suggesting the collapse of both subsections into this test.  The Order (except for aesthetic issues unrelated to this case) was upheld

against municipal challenge in *City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020), *cert. den.* 141 S. Ct. 2855 (2021).

### C. This Court Should Apply the FCC Cost Test to Fiber Lines.

NMSurf's position below in seeking application of the FCC cost test from FCC Order 18-133 to the 2% Fee in the Ordinance was influenced by the broad and general application of large sections of the Order to much more than small cell. NMSurf acknowledges, however, that the Order 18-133 was occasioned by concern over the effect of fees on development of small cell, and the Paragraph 50 fee test quoted above, like other conclusory paragraphs in the Order, specifically references small cell. NMSurf, however, suggests that for both legal and policy reasons, the small cell fee test should be given general application to include fiber lines, or wired lines, such as NMSurf's lines at issue for the 2% Fee.

### 1. Much of the FCC Order Has Broad Application, Well Beyond Small Cell.

Section 253 applies to all telecommunications in the PROW. The statutory language does not distinguish between wireless, small cell wireless, or wired telecommunications, and there is no reason for the Court to adopt separate standards for each one. Although the occasion of the issuance of FCC Order 18-133 was concern over fee barriers for small cell wireless, the broader legal standards the Order referenced were not limited to small cell. For example, the

FCC stated in the Order, in reference to Section 253(a) as a whole and without limitation to small cell, that "we conclude that states and localities do not impose an unreasonable barrier to entry when they merely require providers to bear the direct and reasonable costs caused by their decision to enter the market."  FCC 18-133, at ¶ 56.  The FCC also explained that terms like 'prohibition' have the same meaning in Section 253 and Section 332(c)(7), based on the notion that the same words in different statutes should mean the same thing.  *Id*., at ¶ 36.  Similarly, it stated as to those two sections:

> To be sure, Sections 253 and 332(c)(7) may relate to different categories of state and local fees.  Ultimately, we need not resolve here the precise interplay between Sections 253 and 332(c)(7).  It is enough for us to conclude that, collectively, *Congress intended for the two provisions to cover the universe of fees charged by state and local governments in connection with the deployment of telecommunications infrastructure*.  Given the analogous purposes of both sections and the consistent language used by Congress, we find the phrase "prohibit or have the effect of prohibiting" in Section 332(c)(7)(B)(i)(II) *should be construed as having the same meaning and governed by the same preemption standard* as the identical language in Section 253(a).

FCC Order 18-133, at ¶ 68 (emphasis added).

If the term 'prohibition' means the same thing across statutes, and those statutes relate to the universe of state and local fees for deployment of telecom infrastructure, it follows that the FCC Order cost test should apply to all ROW fees covered by Section 253, which includes fees applied to fiber.

## 2.  The FCC's Concepts Were in Part Drawn From Fiber Cases.

The FCC's cost limitation concepts were in part drawn from case law, or one might say those concepts were a synthesis of existing case law, and as it turns out, those cases were fiber line cases.  For example, the FCC stated, "we agree with courts that have recognized that gross revenue fees generally are not based on the costs associated with an entity's use of the ROW, and where that is the case, are preempted under Section 253(a)."  FCC Order 18-133, at ¶ 70.  Footnote 209, which footnotes that sentence, cited four cases, all fiber line cases:  *Guayanilla*, *supra*, *XO Missouri, Inc. v. City of Maryland Heights*, 256 F. Supp.2d 987 (E.D. Mo. 2003), *Bell Atlantic-Maryland, Inc. v. Prince George's County*, 49 F.Supp.2d 805, 817 (D. MD. 1999), *vac. on other grounds*, 212 F.3d 863, and *AT & T Communications of Southwest, Inc. v. City of Dallas*, 8 F. Supp.2d 582, 593 (NDTX 1998).

## 3.  FCC Policies Applied to Small Cell Also Apply to Fiber.

The FCC supported its interpretation producing the cost test with the concern that "fees imposed by localities, above and beyond the recovery of localities' reasonable costs, materially and improperly inhibit deployment that could have occurred elsewhere."  FCC Order 18-133, at ¶ 60.  Fees in one locality can deplete availability of capital elsewhere.  FCC Order 18-133, ¶¶ 60-65.  This concept applies equally to all telecom infrastructure, not just small cell, and it is a

key part of the FCC analysis.  Non-cost based fees will always deplete funds available for telecom investment.

### 4.  The FCC Cost Test Has Been Applied to Fiber.

NMSurf's suggested approach found case law expression in the recent decision in *Cellco P'ship v. City of Rochester*, 6:192022, WL 3584476 (W.D.N.Y., August 22, 2022), which addressed the application of the FCC 18-133 cost test to both wireless and fiber.  The City of Rochester charges an annual fee for each small cell pole attachment, "and initial and annual fees per linear foot for underground or aerial conduit containing telecommunications facilities <u>such as fiber</u>." *Id*. at 6-7 (emphasis added).  The City argued that the FCC Order did not by its own terms apply to linear telecom facilities, because those were not included within the scope of the FCC Order, an argument much like the District Court's ruling below.  But the district court in *Rochester* sided with Cellco's argument that the FCC Order also applies to fiber, stating:

> The Court agrees with Plaintiff that there is no basis for applying a different standard to fees charged for linear telecommunications facilities than for fees charged for small wireless facilities.  While it was the increased need for small cell deployments that drove the FCC to consider the matter and ultimately issue the Small Cell Order, the statutory interpretation set forth therein is not limited to that context. In particular, there is no reason to conclude that the FCC's interpretation of 'the ambiguous phrase 'fair and reasonable compensation' . . . to allow state or local governments to charge fees that recover a reasonable approximation of the state or local

governments' actual and reasonable costs' is limited to small wireless facilities.'

*Rochester*, at p. 24, citing FCC Order 18-133, ¶ 72.

*Rochester* addressed prior circuit precedent that challengers must first show actual evidence of the economic effect upon the company, and commented that "these cases predate the Small Cell Order." *Rochester*, at p. 26. The court also addressed the effect of FCC Order 18-133 on the interplay between Section 253(a) and (c), and stated that the FCC Order "collapsed the inquiry where fees are concerned—if a fee exceeds a reasonable approximation of a municipality's costs, by definition it is impermissibly prohibitive and does not constitute fair and reasonable compensation." *Id.*, at 27.

Although not binding on this Court, *Rochester* shows that NMSurf's suggestion of applying the FCC cost test to fiber has precedential support. *Rochester* demonstrates that adoption of the FCC test vitiates the requirement of the challenger first showing evidence of economic effect from the alleged prohibition, and that the test compresses the Section 253(a) and (c) analysis into one.

### 5. The Test for Effective Prohibition Should Not be Limited to Dollar Amount or Degree of Increase.

The FCC's cost based approach also makes sense as a rule of broad application, compared to the traditional prohibition standard. Many early Section

253 decisions, like this Court's decision in *Qwest*, were specific to the presented parties and their facts, and those facts related to large incumbents (ILECs) like Qwest around long enough to suffer increases from new ordinances, and large enough to be able to show high dollar figures in fee impact.  Smaller companies without the customer base and income of a large company like Qwest are also impacted by these fees, but without the evidentiary basis that can be shown by a company  like Qwest.   Consider Qwest's successful challenge to the 2010 Ordinance in *Qwest II*.  As discussed by the District Court here, Qwest succeeded because the 3 percent fee would quadruple its operating costs in Santa Fe, and apply the fee to long distance calls.  Opinion, Doc. 139, at p. 14, App. Vol. 2, p. 151, citing *Qwest II*, Findings of Fact and Conclusions of Law, Doc. 484, Dec. 12, 2013.  But would not a small company suffer at least equally, if not more so, with a percentage fee, whether it was an increase or a first time fee for the small company?

    If the 3% fee in the 2010 ordinance could not survive Qwest's challenge, why would the 2% Fee, almost as high, be acceptable now.  The answer must be more than just because a large business like Qwest did not challenge this one.

    This concern would be resolved by adoption of a cost based test like the FCC test.  That test focuses on the actions of the municipality, not the size of the

challenging company, and is designed to prevent telecom ordinances from being profit centers which limit telecom investment and deployment.

### 6.  That Revenue Percentage Fees Have Been Around a Long Time Does Not Mean They Work Under the 1996 TCA.

The District Court wrote at length about the prevalence of revenue percentage fees, stating that the 2% Fee has a "long history" going back to the 1975 Qwest [Mountain West] franchise agreement, that a percentage fee is the norm across other municipalities in  New Mexico, and that in 2013 Qwest paid Albuquerque a 3% fee.  Opinion, Doc. 139, at p. 16, App. Vol. 2, p. 153.   Revenue percentage fees have traditionally applied to large utility companies in New Mexico, and as noted by the District Court, long predate the 1996 adoption of the TCA.  They were not developed to comply with the TCA, but have to be shoe-horned in to the new regulatory structure and new policies of the FCC in support of that structure.  These style of fees do not promote the proliferation of telecommunications; instead they deprive telecom companies of capital.  This is out of step with the TCA and the now years long direction of the FCC.

### D.  The 2% Fee Does Not Survive the Cost Test.

If the FCC cost test is applied to this Ordinance's 2% Fee, the Fee fails and should be preempted.  NMSurf's fiber line is installed on PNM poles, some in the PROW and some over private easements.  The cost to the City is zero, according to

the Affidavit of Albert Catanach, ¶ 10, Ex. 6 to Doc. 129, App. Vol. 1, p. 93.  This

point was not disputed by the Defendants.  In discovery responses, when asked if

the City incurs cost from the new installation or ongoing operation of a

telecommunications facility in the PROW, either underground or in an aerial

installation, the City simply stated that "incremental costs are possible" and that

the City does not separately track them.  Defs. Response to Int. 14 and 15, Doc.

129, Ex. 4, App. Vol. 1, pp. 87-88.  This response from the City did not establish a

genuine dispute of fact to set against Mr. Catanach's affidavit on the incremental

cost issue.  City Defendants could identify costs for PROW maintenance for the

past two years caused by deployment in the PROW of telecom equipment or

facilities.

Further, the City is already well paid by PNM.  From the end of 2019 to the

end of 2020, PNM paid the City about $2.5 million dollars for its use of the

PROW.  Then, providers like NMSurf pay PNM for use of the PNM poles.  PNM

invoice, Ex. 8 to Docs. 129, App. Vol. 1, p. 100, and Catanach Affidavit, ¶ 9, Doc.

129, Ex. 6, 8. App. Vol. 1, p. 93.

It follows that if the FCC fee test is applied, the Fee must fail due to the

absence of evidence that the deployments by NMSurf or others of fiber on PNM

poles in the ROW have any effect on the City's costs.

## II. ALTERNATIVELY, THE 2% FEE FAILS BECAUSE UNTETHERED, OR DISASSOCIATED, FROM DEGREE OF USE OF THE PROW.

The standard of review for this issue is also *de novo*, as explained above.

### A. The 2017 Ordinance's 2% Fee Applies Without Regard to Extent or Degree of Use of the ROW.

The Ordinance's 2% Fee imposed by Chapter 27-2.5(A) is called an "infrastructure maintenance franchise fee".  Subsection (A) states in part:

> there is hereby imposed an infrastructure maintenance franchise fee upon *telecommunications retailers* at the rate of two percent (2%) of all *gross charges* by telecommunications retailers to a *service address* in the city for *telecommunications* originating or received in the city.  (Italics added).

None of these italicized terms, as defined in Section 2.3's definitions, mention the ROW.  As explained by Defendants, the Ordinance "does not distinguish charges that occur as a result of the use of infrastructure inside or outside the PROW".  Defs. Response to Int. 13, Ex. 4 to Doc. 129, App. Vol. 1, p. 87.

This is not surprising, as the Ordinance was based on a model ordinance which also required no connection with the ROW.  The Matthews Municipal Ordinance applies the fee to telecommunications retailers in the municipality, but without any reference to the telecommunications using the ROW.  Ex. 7 to Doc. 129, App. Vol. 1, p. 95.  Of note is that this model answer was given as a response when the City Defendants were asked for the financial or legal basis for the 2%

24

Fee.  In other words, the fee method and amount were drawn from a model related to telecom, but completely unrelated to use of the ROW.

The CNSP Franchise is not as unconnected to the ROW as is the Ordinance. Under the Franchise, the 2% Fee applies if a telecommunication for a customer is accomplished by a telecom network, and the telecom network includes any facilities or equipment in the ROW.  (CNSP Franchise, Doc, 129, Ex. 3, App. Vol. 1, p. 71, definitions of Gross Charge and Telecommunications Network, pp. 4-5.) The 2% Fee would apply if an inch of fiber in the ROW is used to support the signal to the customer, even if that fiber starts on a PNM pole in the ROW, then exits the ROW and travels to the customer through private easements.   Nor does the CNSP Franchise show a connection between the Fee and the costs incurred by the City.

### B.  This Disassociation Requires Preemption.

This lack of accounting for degree of use, and just slapping on a percentage fee once the jurisdictional inch of ROW is present, is not supported by the cases relied upon by the FCC, or the legislative history.

The FCC fiber line cases relied on for its development of the fee test in paragraph 50 of FCC 18-133 are instructive.  In *ATT v. City of Dallas, supra*, the subject ordinance applied the franchise fee to revenue that included long distance and resale revenue.  The court disapproved, stating, "In sum, any fee that is not

based on AT & T's use of City rights-of-way violates § 253(a) of the FTA as an economic barrier to entry." *AT & T v. Dallas*, 8 F. Supp. 2d at 593. Likewise, in *Maryland Heights, supra*, stated, "Several courts have held that fees charged by a municipality must be directly related to a company's use of the local rights-of-way, otherwise the fees constitute an unlawful economic barrier." *Maryland Heights*, 256 F.Supp.2d at 993. The court in *Bell Atlantic-Maryland* stated, similarly, "The crucial point, however, is that any franchise fees that local governments impose on telecommunications companies must be directly related to the companies' use of the local rights-of-way, otherwise the fees constitute an unlawful economic barrier to entry under section 253(a)." *Bell Atlantic-Maryland*, 49 F.Supp.2d at 817.

Thus, the connection between the fee and the ROW is a part of the Section 253(a) analysis, and this is shown in older fiber line cases, having nothing to do with small cell wireless or traditional wireless. This is consistent with the legislative history, part of which was described by the FCC as meaning that "the compensation described in the statute is related to the burden, or cost, from a provider's use of the ROW." FCC Order 18-133, at ¶ 59, describing statements of Rep. Stupak. Although characterized as addressing Section 253(c), the fair and reasonable standard, the legislative comments show that Congress intended for localities to recover only costs caused by the deployment of telecom infrastructure.

The Ordinance lacks connection between the Fee and the ROW, other than that it is a fee owed by any company with a telecommunications franchise and the telecom originates or is received in the City. The Fee is charged under the CNSP Franchise in regard to any customer served by the ROW, even if the customer is on a private easement, or has little connection with the ROW. This is styled after jurisdictional type ordinances, i.e. in the presence of the smallest bit of regulated activity, 2% of all charges in town (here, for fiber line customers), is owed.

## III.  THE CYBERMESA CONTRACT CONTINUES TO GIVE CYBERMESA COMPETITIVE ADVANTAGES WHICH SHOULD BE PREEMPTED AS PROHIBITORY UNDER SECTION 253.

Both parties filed motions for summary judgment on the Cybermesa Contract. The District Court denied NMSurf's motion, ruling that it could not discern "whether the Contract is still operative, and if so, what unique benefits accrue to Cyber Mesa." Opinion, Doc. 139, at p. 21, App. Vol. 2, p. 158. It concluded that NMSurf therefore had not met its evidentiary burden to prove the absence of a genuine dispute of material fact.

The District Court granted the City's motion. The Court found considered two lines of prohibition cases, subsidy to incumbents and ROW exclusion. The Court found that the Cybermesa Contract "does not particularly resemble" the statewide subsidy cases, and did not want to "analogize" to them. *Id*., at pp. 22-23, App. Vol. 2, pp. 159-60. As to the ROW exclusion cases, the District Court stated

that exclusion can be a prohibition unless alternatives are available. *Id.*, at pp. 23-24, App. Vol. 2, pp. 161-62. The Court pointed out that NMSurf acknowledges that it could connect to the Fiber Line, then concluded, "The Court is sympathetic that those options could be costly for CNSP [NMSurf], but CNSP points to, and the Court is aware of, no authority which entitles providers to cost-free market entry." *Id.*, at p. 24, App. Vol. 2, p. 162.

These points will be addressed below, but it is important to note that the thrust of NMSurf's concerns about the Cybermesa Contract is the preferences it gave Cybermesa through the Fiber Line including the Transport Line. That this style of benefit appears to be different from a statewide subsidy given to incumbents is of no import, as the FCC correctly has focused on the distortion to the marketplace of subsidies provided to a competitor. The details will always vary. The District Court did not give market distortion adequate consideration.

The standard of review is the same as with the Ordinance motion, *de novo*.

## A. A Preference or Subsidy Can Be an Effective Prohibition.

In FCC Order 18-133, the FCC reminded of its previous recognition of "the potential for subsidies provided to one competitor to distort the marketplace and create a barrier to entry in violation of Section 253(a)", and reaffirmed that

conclusion.  FCC Order 18-133, at ¶ 58, discussing prior FCC Order 00-309[2] (the

"*Western Wireless Order*").  In the *Western Wireless Order*, the FCC addressed a

Kansas rule (no longer in effect at the time) that provided funding only to

incumbent local exchange carriers ("ILEC").  The FCC explained it "would be

concerned about a universal service fund mechanism that provides funding only to

ILECs", as it would create a barrier to new entrants.  *Western Wireless,* at ¶ 8.

The FCC's economic rationale was important.  It explained that this funding

to the ILEC would lower the price of ILEC provided service.  A new entrant would

have to match that lowered price and lose money, or offer a higher price.  *Id.*  The

FCC pointed out that "it is unreasonable to expect an unsupported carrier to enter a

high-cost market and provide a service that its competitor already provides at a

substantially supported price."  *Id.*  Thus, in the *Western Wireless Order*, a

preference to one provider was treated as a 'substantial barrier to entry' to that

provider's competitors under Section 253(a).  This means that a discussion of

preferences provided to Cybermesa is inherently a discussion of a possible Section

253(a) prohibition.

---

[2] The *Western Wireless Order* is titled In the Matter of Western Wireless
Corporation, Petition for Preemption of Statutes and Rules Regarding the Kansas
Statute and Rules Regarding the Kansas State Universal Service Fund Pursuant to
Section 253 of the Communications Act of 1934, File NO. CWD 98-90, August
18, 2000.

**B. Cybermesa's Competitive Advantages Gave it Impermissible Benefits.**

Because the City paid Cybermesa to construct the Fiber Line, Cybermesa was saved a construction investment in the amount of the construction cost of the Fiber Line itself, close to a million dollars back in 2014. No other internet service provider in Santa Fe received that preference. The nature of the physical location of the Fiber Line, i.e. commencing at the Century Link building site downtown, was well suited for Cybermesa to access the Fiber Line, since Cybermesa's existing network used equipment at the Century Link building, so it could easily tie-in to the Fiber Line. Then, once it installed antennas on roofs on City offices at Market Street, in the Railyard area, Cybermesa had successfully parlayed the free (to Cybermesa) Fiber Line into a fully operational fiber and wireless network active in multiple areas of the City and County, and all the way to Albuquerque through the Transport Line.

This was a clear and substantial subsidy given to Cybermesa and no others. The analysis then moves on to alternatives to NMSurf or others.

For NMSurf to lease use of the Fiber Line from Cybermesa, it would have to install additional fiber, about one mile to connect from Alta Vista Street to the Fiber Line's Market Street connection point, at an estimated cost of $500,000 to $1,000,000. Affidavit of Albert Catanach, ¶ 8, Ex. 2 to Doc. 131, App. Vol. 2, p.

30.  Like the scenario in *Western Wireless*, NMSurf would either have to charge a lower price and lose money, or charge a higher price and lose business to Cybermesa.  Being put in this predicament is the essence of the FCC's concerns with subsidies, and it played out here with the Fiber Line.

Likewise, Cybermesa's pricing will not reflect the cost of the development of the Fiber Line, as Cybermesa did not pay for it; it did not spend its money on construction of the Line.

The District Court's statement that entrants are not owed a cost-free entrance sidestepped the Section 253 issue, which is that Cybermesa was given a cost-free entrance by the Contract.  Whether any provider is owed anything cost-free in other situations is not relevant to the context of the Cybermesa Contract and its effect on telecom competitors, and it was error by the District Court to suggest otherwise.

The District Court also took a narrow view of the treatment of subsidies in *Western Wireless*, stating it would not analogize from *Western* to Cybermesa. Opinion, Doc. 139, at pp. 21-22, App. Vol. 2, pp. 158-59.  NMSurf suggests that the factual pattern is closer to another FCC case, the *Sandwich Isles Order* (In the Matter of Connect America Fund, Sandwich Isles Comm., Inc., WC Docket No. 10-90, June 30, 2017).  *Sandwich Isles* was discussed below at Doc. 131, at pp. 10-11 and 18 (App. Vol. 2, pp. 12-13, 20) to point out that contracts can be legal

requirements under Section 253(a), and to discuss Section 253(c) ROW management, but the fact pattern is instructive.  The FCC considered an exclusive license giving one company the exclusive right to build, construct, repair, maintain and operate a telecom network on the Hawaiian home lands.  The FCC preempted that contract under Section 253(a), even though competitors had the right to lease the network from Sandwich.  The Sandwich Isles contract does appear to be more restrictive[3] than the Cybermesa Contract.  It is raised here to show that the Cybermesa Contract fact pattern is appropriate for consideration as a prohibition under Section 253(a).

### C.  The Current Status of the Cybermesa Contract is Irrelevant.

The District Court's other concern was the uncertainty of whether the Contact has continuing effect, and what benefits Cybermesa has accrued.  The implication is that if the Contract is over, the matter is moot.  It should be first be noted that even the Defendants admitted that holdover provisions were still in effect.  But NMSurf suggests that the whole inquiry of current contract status misses the mark.

The main preference or subsidy to Cybermesa was the construction of the Fiber Line, and in a location suited to Cybermesa where it did not have to pay for a long, expensive fiber line of its own to connect to the Fiber Line.  Those benefits

---

[3] The Sandwich Isles contract apparently prevented other providers from developing their own networks.

32

are still present. Cybermesa is still operating the Fiber Line and the Transport Line. Defs. Response to Int. 1, and Moody April 19, 2021 email, Doc. 131, Ex. 6 and 7, App. App. Vol. 2. pp. 54, 57. As the benefit is in the form of the construction for which Cybermesa was paid under the Contract, and did not have to invest, the subsidy is ongoing beyond the life of the Contract. While the District Court did not identify the subsidy if the Contract were not operative, in fact there would be no significant difference in subsidy with or without the Contract at that point, Cybermesa will be getting the benefit from the Contract by using the Fiber Line either way.

### D. Cybermesa's Exclusive Use of the Transport Line, Considered Part of the Fiber Line, Is Also an Improper Subsidy or Preference.

Separate from the construction of and free access to the Fiber Line is that the City also gave Cybermesa access to the Transport Line, which runs from the Simms Building on St. Francis Drive in the south capitol area of Santa Fe to 505 Marquette in downtown Albuquerque, saving Cybermesa thousands of dollars per month. Other providers do not have access to the Transport Line.

The court in *Zayo Group, LLC v. Mayor and City Council of Baltimore*, 2016 WL 3448261 (DMD 2016) found that Baltimore's preference for Verizon, allowing it exclusive physical access to less costly rights-of-way, may be inconsistent with Section 253(a), and rejected a motion to dismiss. The District

Court here focused on there being other possible ways a new entrant can provide services.  Opinion, Doc. 139, at p. 24, App. Vol. 2 p. 161.  That has been discussed above in reference to access to the Fiber Line.

NMSurf cannot connect to the Transport Line, and to find alternative services would cost about $4,000 per month, an amount that in a small town market like Santa Fe is a lot of money, i.e. $480,000 over 10 years.  Catanach Affidavit, ¶ 8, Ex. 2 to Doc. 131, App. Vol. 2, p. 30.  While providers are not guaranteed cost-free entry, the question is whether Cybermesa was given an improper subsidy or preference, which it clearly was.  Its prices will not reflect the $4,000 per month it would cost NMSurf to obtain something comparable to the Transport Line.

NMSurf suggests that undisputed facts necessary to show improper preferences for Cybermesa are in the record, and are supported by FCC concepts as shown in their case by case rulings, and reiterated in FCC Order 18-133.

Because Cybermesa's access to the Fiber Line and Transport Line is ongoing and obtained without its own capital investment, Cybermesa was preferred over all other competitor providers, and this should be preempted.

### E.  The Section 253(a) Prohibition Created by the Cybermesa Contract is Not Shielded by the Safe Harbor Provision of Section 253(c).

The District Court did not find prohibition under Section 253(a), so it did not advance to analyze whether the City Defendants met their burden under Section 253(c)'s standard that compensation for use of the ROW must be fair and reasonable as well as nondiscriminatory and competitively neutral.  NMSurf suggests that the Cybermesa Contract is not an example of ROW management, and therefore will not fit within the 253(c) safe harbor.

Examples of ROW management according to the FCC include "coordination of construction schedules, determination of insurance, bonding and indemnity requirements, establishment and enforcing of building codes, and keeping track of various systems using the right-of-way to prevent interference between them.  *Sandwich Isles Order*, supra, at ¶ 23.  The Cybermesa Contract has nothing to do with these examples.  If this Court should reverse the District Court on whether the Cybermesa Contract is prohibitory under Section 253(a), it should find against the City Defendants on Section 253(c).

### CONCLUSION

NMSURF asks the Court to reverse, order that the 2% Fee is preempted and order the City Defendants to bar Cybermesa from continued access to the Fiber Line and Transport Line.

Respectfully submitted,

Catron, Catron & Glassman, P.A.

By:_____/s_____
Richard S. Glassman
P.O. Box 788
Santa Fe, NM  87504-0788
(505) 982-1947
richard@catronlaw.com
Attorneys for Plaintiff-Appellant NMSurf, Inc.

No. 22-2131

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

NMSURF, INC.

      Plaintiff-Appellant,

v.

ALAN WEBBER, in his official capacity as
Mayor of the City of Santa Fe, et al.,

      Defendants-Appellees,

and

CITY OF SANTA FE,
      Defendant.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limitation of Fed. R. App. P.

32(a)(1)(7) because, excluding the parts of the document exempted by Fed. R.

App. P. 32(f), this document contains 8,483 words.

Date:  January 20, 2023

                    Catron, Catron & Glassman, P.A.

                    By:___/s_____
                    Richard S. Glassman
                    P.O. Box 788
                    Santa Fe, NM  87504-0788
                    (505) 982-1947
                    richard@catronlaw.com
                    Attorneys for Appellant NMSurf, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that I did on this 20th day of January, 2023, serve a copy of the foregoing Principal Brief, and Volumes 1 and 2 of the Appendix, to Marcos D. Martinez, counsel for Defendants-Appellees, by automatic service through the CM/ECF filing system.

_____/s_____

Richard S. Glassman
