## Case No. 22-2131

*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

---

NMSURF, INC.,
*Plaintiff-Appellant,*

v.

ALAN WEBBER,
in his official capacity as Mayor of the City of Santa Fe, et al.,
*Defendants-Appellees.*

---

*On Appeal from the United States District Court for the District of New Mexico (Albuquerque)*
*Case No. 1:17-CV-00355-KG-SCY · The Honorable Kenneth J. Gonzales, U.S. District Judge*

## BRIEF OF CTIA – THE WIRELESS ASSOCIATION AND USTELECOM – THE BROADBAND ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

JOSHUA S. TURNER, *Counsel of Record*
THOMAS M. JOHNSON, JR.
SARA M. BAXENBERG
WILLIAM TURNER
**WILEY REIN LLP**
2050 M Street NW, Washington, DC 20036
Telephone: (202) 719-7000
jturner@wiley.law • tmjohnson@wiley.law • sbaxenberg@wiley.law • wturner@wiley.law

Counsel for *Amici Curiae*

 COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER 

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* submit the following corporate disclosure statement:

CTIA – The Wireless Association states that it has no parent corporation, and no persons, associations of persons, firms, partnerships, limited liability companies, joint ventures, corporations, or any similar entities have a ten percent or greater ownership interest in CTIA.

United States Telecom Association – The Broadband Association states that it has no parent corporation, and no persons, associations of persons, firms, partnerships, limited liability companies, joint ventures, corporations, or any similar entities have a ten percent or greater ownership interest in US Telecom.

Dated: January 27, 2023                           /s/ Joshua S. Turner
                                                                Joshua S. Turner

i

## TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.......................................i

TABLE OF CONTENTS.......................................................... ii

TABLE OF AUTHORITIES ....................................................iv

GLOSSARY...................................................................vi

IDENTITY AND INTEREST OF AMICI CURIAE ................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................3

ARGUMENT ...................................................................7

I.    It Is Well-Established That Excessive Municipal Fees Can Hamper Communications Infrastructure Deployment In Violation of Federal Law. ....................................................7

   A.    The 1996 Act Was Enacted to Eliminate State and Local Barriers to Competitive Entry.....................................7

   B.    Both Courts and the FCC Have Consistently Recognized that Local Fees Can Have the Effect of Prohibiting the Provision of Service in Violation of Sections 253 and 332....................................................................9

II.   Based on a Thorough Record and Upheld by the Ninth Circuit, the FCC's 2018 Order Thoughtfully Explained Why Even Seemingly Small Fees Can Have Prohibitive Effects........................12

   A.    The FCC Examined the Text, Structure, and Purpose of the 1996 Act and Concluded that Fees Outside the Safe Harbor of Section 253(c) Have the Effect of Prohibiting Service Under Section 253(a). ....................................13

   B.    The FCC Collected Substantial, Nationwide Evidence in an Administrative Record that Showed that Even Seemingly Small Fees Have a Prohibitory Effect When Considered in the Aggregate.......................................15

   C.    The Ninth Circuit Has Considered and Affirmed the Commission's Conclusions Regarding Municipal Fees..........18

III.  Fees Continue to Pose Challenges for Providers of Different Types of Infrastructure Across the Country.......................................19

IV.    It Would Be Consistent with the Precedent of This Circuit and the *2018 Infrastructure Order* to Conclude that Santa Fe's Fees Are Preempted Because They Are Not Cost-Based............................22

V.    To the Extent the Court Disagrees and Affirms the Decision Below, CTIA and USTelecom Urge the Court to Do So on Narrow Grounds. ...................................................................24

CONCLUSION.........................................................................26

CERTIFICATE OF COMPLIANCE.......................................28

CERTIFICATE OF DIGITAL COMPLIANCE.......................29

CERTIFICATE OF SERVICE ...............................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT&T Commc'ns of the Sw., Inc. v. City of Dallas*,
8 F. Supp. 2d 582 (N.D. Tex. 1998) .............................................................11

*Bell Atl.-Md., Inc. v. Prince George's Cnty., Md.*,
49 F. Supp. 2d 805 (D. Md. 1999).............................................................11

*Brown v. Gardner*,
513 U.S. 115 (1994)......................................................................14

*California Payphone Ass'n*,
12 FCC Rcd 14191 (1997)......................................................9, 15

*City of Portland v. United States*,
969 F.3d 1020 (9th Cir. 2020) .........................................................6, 18, 19

*City of Rancho Palos Verdes v. Abrams*,
544 U.S. 113 (2005)......................................................................25

*New Jersey Payphone Ass'n, Inc. v. Town of W. New York*,
130 F. Supp. 2d 631 (D.N.J. 2001), *aff'd*,
299 F.3d 235 (3d Cir. 2002) ......................................................11

*New York SMSA Ltd. P'ship v. Town of Clarkstown*,
603 F. Supp. 2d 715 (S.D.N.Y. 2009),
*aff'd*, 612 F.3d 97 (2d Cir. 2010)...............................................9

*Puerto Rico Tel. Co. v. Municipality of Guayanilla*,
450 F.3d 9 (1st Cir. 2006)......................................................10, 12

*Qwest Corp. v. City of Santa Fe*,
380 F.3d 1258 (10th Cir. 2004) ...........................................9, 10

*Qwest Corp. v. City of Santa Fe*,
No. CV 10-0617 RB/KWM, 2013 WL 12241199
(D.N.M. Dec. 2, 2013)......................................................10

*Sprint Telephony PCS, L.P. v. Cnty. Of San Diego*,
    543 F.3d 571 (9th Cir. 2008) ........................................................... 9

*TCG New York, Inc. v. City of White Plains*,
    305 F.3d 67 (2d Cir. 2002) ............................................................. 10

*XO Missouri, Inc. v. City of Maryland Heights*,
    256 F. Supp. 2d 987 (E.D. MO. 2003) ..................................... 10, 11

**Statutes**

47 U.S.C. § 253 .................................................. 1, 2, 4, 6, 8, 9, 10, 12, 13, 18, 19, 23

47 U.S.C. § 253(a) .................................................... 7, 8, 11, 13, 14, 15, 16, 17, 25

47 U.S.C. § 253(c) ...............................................................13, 14, 15, 19

47 U.S.C. § 332 .................................................. 1, 2, 4, 6, 8, 9, 10, 12, 13, 18, 19

47 U.S.C. § 332(c)(7)(b)(i) ................................................................. 7

47 U.S.C. § 332(c)(7)(B)(i)(II) ........................................................... 8

H.R. REP. NO. 104–458 (1996) (Conf. Rep.), *as reprinted in* 1996
    U.S.C.C.A.N. (100 Stat. 5) 124. ....................................................... 8

Telecommunications Act of 1996, Pub. L. No. 104-104,
    110 Stat. 56 (1996) .......................................................................... 7

**Other Authorities**

FCC Order 18-133, In the Matter of Accelerating Wireless
    Broadband Deployment by Removing Barriers to Infrastructure
    Investment, Declaratory Ruling and Third Report and Order,
    WT Docket No 17-79, 33 FCC Rcd. 9088 (2018) ..... 8, 14, 15, 16, 17, 18, 21

## GLOSSARY

| | |
|---|---|
| 5G | Fifth Generation Wireless Technology |
| The Commission | Federal Communications Commission |
| FCC | Federal Communications Commission |

## IDENTITY AND INTEREST OF AMICI CURIAE[1]

CTIA – The Wireless Association ("CTIA") and USTelecom – The Broadband Association ("USTelecom") are premier communications industry trade associations.  CTIA represents the U.S. wireless communications industry and companies throughout the mobile ecosystem that enable Americans to lead a 21st century connected life.  USTelecom represents service providers and suppliers for the telecom industry.  Its member companies range from large, publicly traded corporations to small rural cooperatives and offer a wide range of services across communications platforms, including broadband, voice, data, and video over wireline and wireless networks.

Although the Appellant in this action is not a member of either trade association, *amici* have a critical interest in the correct interpretation of sections 253 and 332 of the Communications Act.  Those sections help promote a burgeoning, competitive communications marketplace by eliminating barriers to the deployment of telecommunication and wireless facilities and reducing the costs to consumers associated with excessive fees charged by state and local governments.  *Amici* frequently advance this interest through litigation and commenting before the

---

[1] Appellant consents to the filing of this brief.  Appellees "take[] no position" on amici's filing.  No party's counsel authored any part of this brief.  No party or party's counsel, or person other than *amici*, contributed money to the brief's preparation or submission.

Commission on issues that touch upon sections 253 and 332. *See, e.g.*, Brief of Intervenor CTIA, *City of Portland v. United States*, No. 18-72689 (9th Cir., submitted Aug. 15, 2019); Brief of Respondents-Intervenors Verizon and US Telecom, *Am. Elec. Power Serv. Corp. v. FCC*, No. 19-70490 (9th Cir., submitted Aug. 29, 2019); CTIA, Comment on Proposed *2018 Infrastructure Order* (Filed June 15, 2017), https://www.fcc.gov/ecfs/document/10615027601699/1; Comment of USTelecom on Petition to Reconsider *2018 Infrastructure Order* (Filed Nov. 9, 2018), https://www.fcc.gov/ecfs/document/110976678682/1.

This case involves a small, local communications provider with a limited customer base. But a decision in this case could have a significant impact on the U.S. communications industry as a whole, far outstripping the consequences to the parties before the Court. Specifically, a decision in this case has the potential to impact the fees which local jurisdictions are able to charge *amici*'s members to do business, and therefore the members' ability to continue to provide top-tier service throughout the country through improved infrastructure and expansion into underserved markets.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The issues raised by this case may appear somewhat circumscribed at first glance: a single, small communications provider challenging a provision contained in its franchise agreement with a municipality, and that provision imposing a two percent gross revenue fee on a subset of communications services for which the provider does not yet have many subscribers. However, because the challenges here involve federal laws that are central to the continued deployment of advanced communications services, the Court's decision could have broad-ranging impacts on the entire communications industry, both in the Tenth Circuit and around the country.

CTIA and USTelecom are not parties to this dispute, and NMSurf is not a member of either organization. Instead, CTIA and USTelecom file this brief as *amici* to assist the Court with understanding the broader context surrounding communications infrastructure deployment, the development of communications technologies, and the disputes that arise between communications providers and localities. The stakes in these disputes are rarely this small, and when aggregated across the state, circuit, or country, the impact from these kinds of fees can be profound. In light of the unusual facts here, we urge the court to take care not to pre-judge issues that are likely to arise within the circuit on more common fact patterns and different records.

The ability of communications providers to deploy infrastructure is paramount to our ability as a nation to keep pace with technological development and remain connected as a society. This need for rapid and continuous deployment is precisely why Congress enacted Sections 253 and 332 of the Telecommunications Act of 1996 ("1996 Act"), and why the Federal Communications Commission ("FCC" or "Commission")—the federal agency charged with carrying out the 1996 Act—and courts have spent so much time applying those provisions to specific cases, issues, and questions in the area of infrastructure deployment.

In adopting the 1996 Act nearly 30 years ago, Congress struck a balance between the traditional authority held by states or their subdivisions and the important federal interest in bringing advanced, competitive communications technologies to all Americans. By broadly preempting all state and municipal actions that "prohibit or have the effect of prohibiting" telecommunications services and wireless services, respectively, Sections 253 and 332 established that while localities may regulate other utilities or entities in certain ways, the rules are different for telecommunications providers. Consistent with these provisions, courts and the FCC have held preempted numerous state and local rules, requirements, application processes, and other actions that unduly infringed providers' ability to deploy infrastructure and compete.

4

The deregulatory, pro-competitive regime created by the 1996 Act allowed telecommunications deployment and the development of new communications services to flourish across the country.  The ability of carriers to build and upgrade networks pursuant to the Act has allowed the United States to be a continuous leader in cutting-edge communications technologies.  Recent history has shown the importance of continuing to expand the coverage of high-speed communications networks, and the transformative effect that fiber optic bandwidth can have on Americans' daily lives, including their ability to work and learn from home, access healthcare, find employment, and more.  Businesses in nearly every sector of our economy have come to depend on access to high-speed communications and broadband.  While there is still much work to do to close the digital divide, more Americans are connected to fiber optic, broadband, and telecommunications networks than ever before.

America's success in building out network facilities is also helping to enable millions of Americans to access low-latency, high-throughput fifth generation ("5G") wireless service.  Wireless networks have become one of the backbones of our nation, and continued innovation will allow Americans to take advantage of even more technologies that improve quality of life, enable full participation in society, and breed prosperity for our country and the people who live in it. And while it is tempting to see this as a "wireless revolution that . . . represents the triumph of

5

cellular technology over just about everything else in telecommunications services,"
*City of Portland v. United States*, 969 F.3d 1020, 1031 (9th Cir. 2020), these wireless
services complement—and cannot exist without—advanced fiber optic services,
which provide backhaul and allow vast amounts of data to move seamlessly across
the country.

At the same time, new and evolving state and municipal laws repeatedly raise
questions about the operation of Sections 253 and 332, and roadblocks erected by
those localities continue to pose a threat to the communications landscape and its
future.  In 2018, the FCC confronted a record showing that localities were still
impeding the deployment of communications networks, and that these local
restrictions stood in the way of deploying 21st century technologies—in particular,
of the facilities necessary for 5G.  In so doing, the Commission reaffirmed its long-
standing effective prohibition standard under the Communications Act and applied
that standard in a number of contexts, including to local right-of-way fees that are
not cost-based.

The City of Santa Fe has imposed a non-cost-based fee on a carrier using fiber
optic cable—infrastructure that is critical to modern networks.  NMSurf is correct
that this fee is inconsistent with Section 253.  For the reasons NMSurf articulates
and as explained in additional detail below, it would be in line with the law of this
circuit, FCC precedent, and the Congressional objectives embodied in the 1996 Act

for this Court to hold that the City's two percent gross revenue fee is preempted by the 1996 Act, because it is wholly unrelated to both the City's costs and providers' use of the rights-of-way.

To the extent that the Court reaches a different result, it should do so on as narrow grounds as possible, so as to avoid broader, industry-wide effects on the ability of providers to deploy infrastructure.

## ARGUMENT

## I. IT IS WELL-ESTABLISHED THAT EXCESSIVE MUNICIPAL FEES CAN HAMPER COMMUNICATIONS INFRASTRUCTURE DEPLOYMENT IN VIOLATION OF FEDERAL LAW.

### A. The 1996 Act Was Enacted to Eliminate State and Local Barriers to Competitive Entry.

In the Telecommunications Act of 1996, Congress took steps to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, Pmbl., 110 Stat. 56, 56 (1996). One of these steps was to amend the Communications Act to expressly preempt any municipal conduct that has the effect of prohibiting the ability to provide telecommunications services. 47 U.S.C. §§ 253(a), 332(c)(7)(b)(i). In adopting these provisions and the Act more generally, Congress sought to create a "pro-competitive, deregulatory national policy framework" to ensure that telecommunications providers could build out networks, and upgrade

7

those networks, to rapidly and continuously bring advanced technologies to consumers across the country.  H.R. REP. NO. 104–458, at 113 (1996) (Conf. Rep.), *as reprinted in* 1996 U.S.C.C.A.N. (100 Stat. 5) 124.

As the FCC explained in its *2018 Infrastructure Order*, "[t]he 1996 Act [] makes clear Congress's commitment to a competitive telecommunications marketplace unhindered by unnecessary regulations."  *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, Declaratory Ruling and Third Report and Order, 33 FCC Rcd. 9088, ¶ 14 (2018) ("*2018 Infrastructure Order*").  To this end, the 1996 Act "enacted sweeping new provisions intended to facilitate the deployment of telecommunications infrastructure," including Sections 253 and 332.  *Id*.

Under Section 253 of the Communications Act, "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).  Section 332 of the Act contains an identical "prohibition of service" limitation with respect to localities' "regulation of the placement, construction, and modification of personal wireless service facilities."  *Id*. § 332(c)(7)(B)(i)(II).  Both courts and the FCC have held that the equivalent language used in Sections 253 and 332 with respect to effective prohibition should be read consistently, such that Sections 253 and 332 impose an

identical standard by which to evaluate state and local conduct. *See, e.g., Sprint Telephony PCS, L.P. v. Cnty. Of San Diego*, 543 F.3d 571, 579 (9th Cir. 2008); *New York SMSA Ltd. P'ship v. Town of Clarkstown,* 603 F. Supp. 2d 715, 731-32 (S.D.N.Y. 2009), *aff'd*, 612 F.3d 97 (2d Cir. 2010); *2018 Infrastructure Order* ¶ 67.

The FCC established a test for analyzing effective prohibitions shortly after the 1996 Act was adopted. Pursuant to the FCC's *California Payphone* decision, a state or local action has the effect of prohibiting service if it "materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *California Payphone Ass'n*, 12 FCC Rcd 14191, ¶ 31 (1997). This test has been endorsed and applied by numerous courts, including the Tenth Circuit. *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1271 (10th Cir. 2004).

Sections 253 and 332 are central to the vision of the 1996 Act, in that they expressly preempt municipal regulation that would otherwise interfere with the important federal prerogatives the Act seeks to promote.

**B.    Both Courts and the FCC Have Consistently Recognized that Local Fees Can Have the Effect of Prohibiting the Provision of Service in Violation of Sections 253 and 332.**

From zoning and building laws, to permitting procedures, to controlling access to the rights-of-way, to imposing franchise requirements, there are numerous ways in which a state or locality can erect a barrier that materially inhibits

communications services—including the imposition of fees.  As the FCC observed

in its *2018 Infrastructure Order*, "[f]ederal courts have long recognized that the fees

charged by local governments for the deployment of communications infrastructure

can run afoul of the limits Congress imposed in the effective prohibition standard

embodied in Sections 253 and 332."   ¶ 43.

This Court has invalidated local fees pursuant to Section 253, holding in 2004

that exorbitant fees imposed on equipment cabinets had the effect of prohibiting

service.  *Qwest Corp.*, 380 F.3d at 1271.  Santa Fe's fee provisions were found to

"nearly quadruple Qwest's cost of doing business," and such a massive increase in

cost was prohibitive to Qwest's ability to operate.  *Id.*  Based on this precedent, in

2013 the district court held that Section 253 preempted a three percent gross revenue

fee imposed by a Santa Fe ordinance.  *Qwest Corp. v. City of Santa Fe*, No. CV 10-

0617 RB/KBM, 2013 WL 12241199, at *15 (D.N.M. Dec. 2, 2013).

Other federal court decisions from all over the country have reached similar

results.  For example, in *Puerto Rico Tel. Co. v. Municipality of Guayanilla*, the First

Circuit held preempted a five percent gross revenue fee, 450 F.3d 9, 17 (1st Cir.

2006).  Similarly, in *TCG New York, Inc. v. City of White Plains*, the Second Circuit

held that a five percent gross revenue fee was "[t]he most significant provision" in

an ordinance that the court found as a whole effectively prohibited service, 305 F.3d

67, 77 (2d Cir. 2002).  Similarly, in *XO Missouri, Inc. v. City of Maryland Heights*,

a 322% increase in fees by the City of Maryland Heights was considered an "unlawful economic barrier to entry under § 253(a)."  256 F. Supp. 2d 987, 993-95 (E.D. Mo. 2003).

In determining that fees could be preempted under the 1996 Act, numerous courts have recognized that fees must, at a minimum, bear at least some relationship to a local jurisdiction's costs to pass muster under the Act, and those fees that are wholly unrelated to costs are barred by statute.  *See, e.g., XO Missouri, Inc.*, 256 F. Supp. 2d at 994 ("The Court adopts the reasoning supporting other courts' decisions that revenue-based fees are impermissible under the [1996 Act]."); *New Jersey Payphone Ass'n, Inc. v. Town of W. New York*, 130 F. Supp. 2d 631, 638 (D.N.J. 2001), *aff'd*, 299 F.3d 235 (3d Cir. 2002) (holding preempted franchise fee ordinance with "no logical link at all to costs" borne by defendant town in the management of its rights-of-way); *AT&T Commc'ns of the Sw., Inc. v. City of Dallas*, 8 F. Supp. 2d 582, 593 (N.D. Tex. 1998) ("any fee that is not based on [a provider's] use of City rights-of-way violates § 253(a) of the [1996 Act] as an economic barrier to entry"); *Bell Atl.-Md., Inc. v. Prince George's Cnty., Md*., 49 F. Supp. 2d 805, 817 (D. Md. 1999) (explaining that if localities could "charge franchise fees that were unrelated either to a telecommunications company's use of the public rights-of-ways or to a local government's costs of maintaining and improving its rights-of-way, then local governments could effectively thwart the [1996 Act's] pro-competition mandate and

11

make a nullity out of section 253(a)") (vacated on other grounds); *Guayanilla*, 450 F.3d at 22 ("We need not decide whether fees imposed on telecommunications providers by state and local governments must be *limited* to cost recovery. We agree with the district court's reasoning that fees should be, at the very least, *related* to the actual use of rights of way[.]") (emphasis in original).

## II.    BASED ON A THOROUGH RECORD AND UPHELD BY THE NINTH CIRCUIT, THE FCC'S 2018 ORDER THOUGHTFULLY EXPLAINED WHY EVEN SEEMINGLY SMALL FEES CAN HAVE PROHIBITIVE EFFECTS.

In 2018, the FCC took a comprehensive look at the communications landscape and the challenges impacting deployment of modern communications networks. Cognizant of the "urgent need to streamline regulatory requirements to accelerate the deployment of wireless infrastructure for current needs and for the next generation of wireless service in 5G," the Commission undertook to clarify the application of Sections 253 and 332, thereby "allowing more modern rules for modern infrastructure." *2018 Infrastructure Order* ¶ 28. In so doing, the Commission sought to advance the purposes of the 1996 Act by facilitating "smart infrastructure policy" for 21st century networks. *2018 Infrastructure Order* ¶ 2.

In addition to looking to the statute itself and the 20 years of precedent interpreting and applying it, the Commission had before it a comprehensive record containing vast, nation-wide, real-world evidence about the aggregate cost of imposing fees on communications companies. As a result, the Commission made

several important clarifications about the application of Sections 253 and 332. While the Commission focused heavily on the deployment of small cell infrastructure because of its role in 5G deployment, the agency's reasoning about the proper interpretation of the statutes is based on the statutory text, which should have broad application across the communications ecosystem.

**A. The FCC Examined the Text, Structure, and Purpose of the 1996 Act and Concluded that Fees Outside the Safe Harbor of Section 253(c) Have the Effect of Prohibiting Service Under Section 253(a).**

Section 253(a) places a limit on the authority state and local governments have when regulating telecommunications providers, preempting regulations that "prohibit or have the effect of prohibiting" the provision of service. 47 U.S.C. § 253(a). Endorsing case law on this issue from a variety of courts, the Commission agreed that state and local fees imposed on communications infrastructure of all types can violate this provision. *2018 Infrastructure Order* ¶¶ 43-45. At the same time, the Commission recognized that Section 253(c) allows municipalities to collect "fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis." 47 U.S.C. § 253(c).

In analyzing the interplay of these provisions, the Commission reaffirmed that section 253(a) "broadly limit[s] the ability of state[s] to regulate[.]" *2018 Infrastructure Order* ¶ 53 (bracketing modified). Congress made clear its desire for

13

broad preemption, the Commission said, by placing section 253(a) before the narrowly-tailored saving clause in 253(c).  *Id.* (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44-45 (1987); *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 189-90 (2d Cir. 2010); *Frank v. Delta Airlines, Inc.*, 314 F.3d 195, 199 (5th Cir. 2002); *cf. United States v. Kay*, 359 F.3d 738, 756 (5th Cir. 2004) (justifying a broad reading of a statute given that Congress "narrowly defin[ed] exceptions and affirmative defenses against a backdrop of broad applicability")). After all, section 253(c), while a saving clause, "includes qualifications and limitations to cabin state and local action . . . in ways that ensure appropriate protections for service providers."  *2018 Infrastructure Order* ¶ 55.

Accordingly, the Commission interpreted "[s]ection 253(c)'s 'fair and reasonable compensation' provision to refer to fees that represent a reasonable approximation of actual and direct costs incurred by the government, where the costs being passed on are themselves objectively reasonable."  *Id.*  The Commission grounded its interpretation in the text, which is itself sufficient to "give a clear answer" and be "the end of the matter."  *Brown v. Gardner*, 513 U.S. 115, 120 (1994).  But the Commission also noted that legislative history reinforces its understanding of section 253(c).  *2018 Infrastructure Order* ¶ 59.

Consistent with this analysis, the *Order* concluded that "the substantive standards for fees that Congress sought to insulate from preemption . . . [are] an

appropriate ceiling for state and local fees" with respect to the small cell deployments that were the subject of the proceeding. *Id.* ¶ 53. Thus, although the FCC refrained from "decid[ing] today whether Section 253(a) preempts all fees not expressly saved by Section 253(c) with respect to all types of deployments," *id.*, it concluded based on the record before it that local fees must be limited to costs with respect to the types of fees that the Commission considered in the *Order*.

### B. The FCC Collected Substantial, Nationwide Evidence in an Administrative Record that Showed that Even Seemingly Small Fees Have a Prohibitory Effect When Considered in the Aggregate.

The Commission's 2018 Order was also concerned with the real-world effects of excessive fees. Relying on *California Payphone*, the Commission noted that even the threat that a state or local government could impose a fee that either goes beyond actual costs or lacks neutrality could "materially and improperly inhibit" capital investment and development. *Id.* ¶ 60. The imposition of such fees thus cause an actual, material inhibition in the ability to provide service even outside the jurisdiction where the fees are imposed. Thus, as "an additional, independent justification" for its determination, the FCC pointed to "the simple, logical premise, supported by the record, that state and local fees in one place of deployment necessarily have the effect of reducing the amount of capital that providers can use to deploy infrastructure elsewhere, whether the reduction takes place on a local, regional or national level." *Id.*

These concerns about fees stifling investment were not imaginary or speculative. "The record" the Commission considered before issuing the 2018 Order "is replete with evidence that providers have limited capital budgets that are constrained by state and local fees." *Id*. ¶ 61. For example, a comment from a major wireless provider pointed to cities in three states that have "directly resulted in paused or decreased deployments." *Id*. "Based on the record, [the Commission found] that fees charged by states and localities are causing *actual* delays and restrictions on deployments of Small Wireless Facilities in a number of places across the country in violation of Section 253(a)." *Id*.

This is true even for small fees, the Commission determined, because those fees cause an aggregate effect that hampers nationwide network development. *Id*. ¶ 60. One major wireless provider pointed out that large cities have little incentive to not overcharge for right-of-way access. *Id*. ¶ 61. When large cities do so, providers allocate resources to those cities and away from rural and mid-sized cities. *Id*. These smaller areas, the Commission noted, are the "hardest hit by excessive government fees. . . ." *Id*. ¶ 63.

This Commission was especially concerned about the hidden impact of this kind of rent-seeking by major cities on smaller towns. "When evaluating whether fees result in an effective prohibition of service due to financial burden, we must consider the marketplace regionally and nationally and thus must consider the

16

cumulative effects of state or local fees on service in multiple geographic areas that providers serve or potentially would serve." *Id.* ¶ 62.

> A contrary, geographically-restrictive interpretation of Section 253(a) would exacerbate the digital divide by giving dense or wealthy states and localities that might be most critical for a provider to serve the ability to leverage their unique position to extract fees for their own benefit at the expense of regional or national deployment by decreasing the deployment resources available for less wealthy or dense jurisdictions.

*Id.* ¶ 63.

The extensive record evidence before the Commission led it to conclude that even small, non-cost-based fees in cities that had the power to charge them would interfere with one of the Act's key objectives: making communications technology available for "all Americans[.]" *Id.* ¶ 62.

While here, the Commission was focused on small cell demand, including the estimated 800,000 deployments expected to be completed by 2026 and the corresponding impacts that excessive small cell fees could have on investment and the digital divide, the market and policy principles the Commission examined have broader applicability—particularly given the nature of modern communications networks. As the *2018 Infrastructure Order* acknowledges, the "current wireless marketplace is characterized by a wide variety of offerings with differing service characteristics and deployment strategies," and accordingly, the application of

Sections 253 and 332 cannot "view wireless service as if it were a single, monolithic offering[.]" *Id*. ¶ 40.

### C.    The Ninth Circuit Has Considered and Affirmed the Commission's Conclusions Regarding Municipal Fees.

A federal circuit court has already affirmed the Commission's reasoning in the *2018 Infrastructure Order*. Several parties challenged the order after its adoption, and the Ninth Circuit heard the consolidated challenges.[2] The court upheld the *Order* in all relevant respects, rejecting the local governments' challenges to the Commission's conclusions about the prohibitory impact of fees. *City of Portland*, 969 F.3d at 1038. The court held that it was reasonable for the Commission to conclude that "above-cost fees, in the aggregate, were having a prohibitive effect on a national basis." *Id*. The court also noted the impracticability of the alternative, concluding that it would be "a nearly impossible administrative undertaking" to separately examine "the prohibitive effect of fees in each of the 89,000 state and local governments under the FCC's jurisdiction." *Id.*

In upholding the order, the Ninth Circuit further agreed that "[t]he record . . . supports the FCC's factual conclusion that high fees in one jurisdiction can prevent

---

[2] The lottery initially assigned the case to the Tenth Circuit, which subsequently granted the local government petitioners' motion to transfer to appeal to the Ninth Circuit. *Sprint Corp. v. FCC*, No. 18-9563 (10th Cir. filed Jan. 10, 2019), http://src.bna.com/EDa. Before doing so, the Tenth Circuit denied the petitioners' motion to stay the effectiveness of the *2018 Infrastructure Order*. *Sprint Corp. v. FCC,* No. 18-9563 (10th Cir. filed Jan. 10, 2019), http://src.bna.com/EDb.

deployment in other jurisdictions." *Id*. at 1039. The Court also affirmed the Commission's treatment of Section 253(c), agreeing that its requirement "that compensation be 'fair and reasonable' . . . does not mean that state and local governments should be permitted to make a profit by charging fees above costs." *Id*.

### III. FEES CONTINUE TO POSE CHALLENGES FOR PROVIDERS OF DIFFERENT TYPES OF INFRASTRUCTURE ACROSS THE COUNTRY.

In the wake of the *2018 Infrastructure Order*, the process of understanding how the order's clarifications of Sections 253 and 332 apply to the numerous exactions assessed by municipalities across the country is still in its infancy. As those municipalities seek to defend preexisting fees and impose new ones, the work of untangling the permissible from the preempted requires careful application of the requirements and principles outlined by the FCC. Accordingly, fees continue to be a significant problem—often on a large scale—for the communications industry.

Indeed, the record before the Commission when it adopted the *2018 Infrastructure Order* demonstrated that municipalities charge fees that have a range of different bases and purported justifications and that can be significant in magnitude. In addition to fees imposed on small cell facilities, the record showed numerous other examples of fees assessed on other types of infrastructure that are essential to modern networks. These exactions included application fees[3]; recurring

---

[3] *See, e.g.*, Letter from Keith Buell, Sprint, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79, at 1 (filed Aug. 13, 2018),

per-facility fees assessed on each pole, collocation, node, or even antenna (of which

there can be dozens on a single site)[4]; per-foot fees for linear infrastructure[5];

---

https://www.fcc.gov/ecfs/document/108130888126150/1 (explaining that Los Angeles County's siting process "takes a year or more and imposes application fees of $9,820"); Comments of Crown Castle Int'l, WT Docket No. 17-79 at 10-13 (June 15, 2017) (noting application fees of $1,000 per collocation or $2,000 for new or replacement pole, followed by a $20,000 second phase application fee for a new or replacement pole in Montgomery County, Maryland; $2,000 per carrier per node in Brookville New, York; and $15,000 per utility pole to the Virginia Department of Transportation).

[4] *See, e.g.*, Letter from Tamara Preiss, Vice President, Federal Regulatory and Legal Affairs, Verizon, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79, (filed Aug. 10, 2018), https://www.fcc.gov/ecfs/document/10810285875669/1 (identifying recurring fees including $1,872 per pole per year in Seattle; $1,800-2,200 per pole per year in Fresno, California; and $4,300 per pole per year in Rancho Cordova, California); Letter from Henry Hultquist, Vice President, Federal Regulatory, AT&T, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79 (filed Aug. 6, 2018), https://www.fcc.gov/ecfs/document/10806085432193/1 ("AT&T Letter") (identifying recurring fees including $1,995 per node in Lincoln, Nebraska; $5,000 per pole in Baltimore, Maryland; and $2,300 per node in Oakland, California); Letter from Kenneth J. Simon, Senior Vice President and General Counsel, Crown Castle, to Marlene H. Dortch, Secretary, FCC, WT Docket No. 17-79 (filed August 10, 2018), https://www.fcc.gov/ecfs/document/10810312521593/1 ("Crown Castle Letter") (identifying a recurring fee of $6,000 per antenna in Cottleville, Missouri).

[5] *See, e.g.*, Comments of the Wireless Infrastructure Association, WT Docket No. 17-79, at 15 (filed June 15, 2017), https://www.fcc.gov/ecfs/document/106152034130422/1 (identifying linear foot charges of more than six dollars per foot in up-front "deposits" for application review).

recurring "right-of-way use" fees[6]; license fees[7]; and consultant fees[8]; among others. For each type of fee, the record featured examples ranging in the thousands to tens of thousands of dollars, with localities often using multiple types of fees in conjunction. The resulting fee burdens included in the administrative record totaled in the hundreds of thousands annually, even for small networks in single districts within a municipality.[9]

Ongoing litigation around the country demonstrates that state and municipal fees continue to pose an issue for deployment. In various jurisdictions, carriers are seeking judicial relief from burdensome fee obligations including a fiber and small cell regime resulting in more than $225,000 annually for a single provider, *see Crown Castle Fiber LLC v. City of Rochester*, No. 20-cv-6866, Complaint, ECF No. 1 (W.D.N.Y. filed Oct. 20, 2020); small cell fees that are orders of magnitude higher than the safe harbor established in the *2018 Infrastructure Order, see id.*; *New*

---

[6] *See, e.g.*, AT&T Letter at 2 (identifying an annual recurring fee for right-of-way rights of $25,000 in Howard County, Maryland).

[7] *See, e.g.*, Crown Castle Letter at 4 (identifying annual license fees of $2,500 in Dallas, Texas); AT&T Letter at 2-3 (identifying non-recurring fees of $10,000 upon execution of an agreement in Howard County, Maryland, and $20,000 in Lowell, Massachusetts).

[8] *See, e.g., 2018 Infrastructure Order* ¶ 25 n.49 (noting evidence from Crown Castle that Hillsborough, California sent an invoice for an additional $351,773 after denying an application, "most of which appears to be related to outside counsel fees").

[9] *See, e.g.*, Crown Castle Letter at 4 ("Based on the final proposed fiber fees, this compact network in the central business district would have been subject to annual fees totaling in excess of $280,000 per year.").

*Cingular Wireless PCS, LLC v. City of Pittsburgh*, No. 21-cv-443 (W.D. Penn. filed Apr. 6, 2021)*; ExteNet Sys., Inc. v. Village of Plandome*, No. 19-cv-07054 (E.D.N.Y. filed Dec. 17, 2019); design guidelines that would require a provider to reengineer an energy utility's poles at an added cost of as much as $2 million, *Crown Castle Fiber LLC v. City and Cnty. of Denver*, No. 1:21-cv-01070 (D. Col. filed Apr. 16, 2021); and a regime that required a carrier to pay $103,900 in escrow fees and application fees to a municipality to even be permitted to apply to deploy infrastructure, *Crown Castle NG East LLC v. Village of Laurel Hollow*, No. 18-cv-7397 (E.D.N.Y. filed Dec. 27, 2018)—just to name a few.

As providers continue to work on updating their networks to keep pace with changing technology, the application of the principles espoused in the FCC's *2018 Infrastructure Order* will be critical to keeping exorbitant fees at bay and ensuring, as Congress intended, that communications providers are free from burdensome barriers to entry and have sufficient capital budgets to make the massive infrastructure investments necessary to close the digital divide and for 5G, 6G, and beyond.

## IV. IT WOULD BE CONSISTENT WITH THE PRECEDENT OF THIS CIRCUIT AND THE *2018 INFRASTRUCTURE ORDER* TO CONCLUDE THAT SANTA FE'S FEES ARE PREEMPTED BECAUSE THEY ARE NOT COST-BASED.

The franchise fee provision at issue here assesses a two percent gross revenue charge on NMSurf based on its operation of fiber optic facilities within the City of Santa Fe. CTIA and USTelecom agree with the Appellant that this fee is preempted

under Section 253, as interpreted by the courts and the Commission.  NMSurf is also correct that while the *2018 Infrastructure Order* was "occasioned by concern over the effect of fees on [small cell deployment]," "legal and policy reasons" support "general application" of a cost-based limitation on fees "to include fiber lines" such as those at issue in this case.  App. Br. at 16.  To this end, Appellant accurately recognizes that the effect on investment caused by excessive or non-neutral fees applies with equal force whether in the small cell context or a situation involving other telecommunications infrastructure.  *Id*. at 13.

Appellant also accurately explains that the two percent gross revenue fee has no connection whatsoever to NMSurf's use of the rights-of-way, the impact that NMSurf's infrastructure has on the rights-of-way, and, critically, the city's costs to manage the rights-of-way.  *Id*. at 25.  Accordingly, NMSurf is correct that it would be consistent with FCC precedent, the law of this circuit, and other case law interpreting Section 253, to hold the franchise fee preempted.  Indeed, the Court could reverse the district court solely on the basis that the City of Santa Fe imposed a fee that has no connection to the use of the rights-of-way, without even reaching the magnitude of the fee at issue here.

## V.     TO THE EXTENT THE COURT DISAGREES AND AFFIRMS THE DECISION BELOW, CTIA AND USTELECOM URGE THE COURT TO DO SO ON NARROW GROUNDS.

At a minimum, this Court should carefully consider the broader context in which it is being asked to render a decision and avoid resolving this case in a manner that could have significant consequences for the communications industry at large.

The facts in this case are extremely unusual, and by no means represent the typical experience providers face in deploying communications facilities. The fact that the Plaintiff has only two customers and pays approximately $12 per year distinguish it from even the typical small competitive carrier, who would generally have many more customers and pay far more in fees, even on two percent of gross revenue—and, as set forth above, many jurisdictions impose much higher fees.

In part, it is not common for a carrier to be able to challenge a fee like this one before it has developed an established customer and revenue base—which, ironically, can prevent the very competitive carriers that the Act was designed to encourage from even getting to the point where they can challenge prohibitive fees. Nevertheless, a precedential decision on these idiosyncratic facts might inadvertently reach other aspects of infrastructure (such as facilities, fee structures, and fee amounts) not raised here. Such a decision could significantly hinder the ability of providers to deploy new infrastructure.

24

If cities within the Tenth Circuit continue to impose right-of-way fees not tied to cost, this Court will have additional opportunities to consider the issue. Limiting the decision in this case to a carefully-tailored, record-bound holding in a non-precedential opinion would afford the Court the opportunity to consider municipal fees in a context where the kinds of concerns that motivated Congress, the courts, and the Commission's *2018 Infrastructure Order* are more clearly presented.

Indeed, future cases are far more likely to involve a provider with more than two customers, meaning a provider with greater incentive to make the capital investments in furtherance of "rapid deployment of new telecommunications technologies" that the Act seeks to promote. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005). Further, modern networks often rely on a combination of technologies, and future cases may also involve the wireless infrastructure that "has already revolutionized the way Americans communicate and transformed the U.S. economy," *2018 Infrastructure Order* ¶ 23, and will continue to do so.

At the very least, the Court could consider whether this case should be remanded to the district court for further factual development. The Commission recognized that certain fees for small cell deployment might be so small that they presumptively do not run afoul of sections 253(a) or 332(c)(7) and are presumptively fair and reasonable. *Id.* ¶ 78. While the Commission did not consider other facilities

in this conclusion, it may be possible to apply this logic to the kind of fiber facilities that NMSurf is deploying.  However, the record below does not reflect plaintiff's making a showing in that regard—or even presenting any argument on the point. Thus, a third option for the Court would be to remand and allow the district court to make factual findings based on further record development – or the evidence already in the record.

Regardless of which approach this Court chooses, it should not rule out the possibility that a future case might present a more developed record where a local government is charging more than a *de minimis* fee and the prohibitive effects that animated the *2018 Infrastructure Order* result.  It should thus consider resolving this matter in a non-precedential fashion that does not unduly prejudice such future disputes.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below, or alternatively, (i) issue a narrow, record-bound opinion affirming; or (ii) remand for further factual development.

Dated: January 27, 2023                    Respectfully submitted,


                                           CTIA – THE WIRELESS
                                           ASSOCIATION and USTELECOM –
                                           THE BROADBAND ASSOCIATION
                                           By Counsel

                                           */s/ Joshua S. Turner*
                                           _____

                                           Joshua S. Turner
                                                *Counsel of Record*
                                           Thomas M. Johnson, Jr.
                                           Sara M. Baxenberg
                                           William Turner
                                           WILEY REIN LLP
                                           2050 M St. NW
                                           Washington, DC 20036
                                           Tel: (202) 719-7000
                                           jturner@wiley.law

                                           *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief of CTIA – The Wireless Association and USTelecom – The Broadband Association as *Amici Curiae* in support of Plaintiff-Appellant complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

I further certify that this document complies with the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32 (B), this document contains 6,139 words.

Dated: January 27, 2023

/s/ Joshua S. Turner
Joshua S. Turner

## CERTIFICATE OF DIGITAL SUBMISSION

Counsel for *Amici Curiae* hereby certify that all required privacy redactions have been made, which complies with the requirements of Federal Rules of Appellate Procedure 25(a)(5).

Counsel also certifies that the hard copies submitted to the Court are exact copies of the ECF filing of January 27, 2023.

Counsel further certifies that the ECF submission was scanned for viruses with the most recent version of a commercial virus scanning program (Vipre software version 13.0.8334; Definitions version 107242 – 7.93927 [January 27, 2023]; Vipre engine version 6.0.9.9 – 0.0.0.0), and according to the program, is free of viruses.

Dated: January 27, 2023          /s/ Joshua S. Turner
                                       Joshua S. Turner

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, I filed the foregoing Brief of CTIA – The Wireless Association and USTelecom – The Broadband Association as *Amici Curiae* in support of Plaintiff-Appellant with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. All participants in this case who are registered CM/ECF users will be served a true and correct copy of this Brief through that system.

Dated: January 27, 2023                    /s/ Joshua S. Turner
                                                              Joshua S. Turner